## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. CHANDRA MERRITT,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:21-CV-17 (HL) |
| **AMEDISYS, INC., AMEDISYS GEORGIA, L.L.C., and DR. JAMES GRAHAM,** | |
| Defendants. | |

## ORDER

Relator Chandra Merritt brought this action on behalf of the United States of America pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), against Defendants Amedisys Inc., Amedisys Georgia, L.L.C., and Dr. James Graham for alleged fraudulent practices. Before the Court is Defendants' Motion to Dismiss Relator's Complaint for failure to state a claim upon which relief may be granted. (Doc. 29). After considering the motions, pleadings, and applicable law, the Court **DENIES** Defendants' motion.

## I.    BACKGROUND

Defendant Amedisys, Inc. ("Amedisys") is a publicly traded corporation engaged in the home health care and hospice business (Doc. 1, ¶ 3). Amedisys operates approximately 321 home health care agencies throughout the United

States. (Id.). The company primarily targets patients enrolled in the Medicare Program. (Id.). Defendant Amedisys Georgia, L.L.C. ("Amedisys Georgia") is a subsidiary of Amedisys.[1] (Id. at ¶ 4). Amedisys Georgia manages home health care agencies throughout Georgia, including the Tifton, Georgia Amedisys Agency ("Tifton Agency"). (Id.). Defendant James L. Graham ("Dr. Graham") is a Family Medicine physician. (Id. at ¶ 5). Dr. Graham has served as the Tifton Agency's Medical Director since 2011. (Id.). As the Medical Director, Dr. Graham is responsible for reviewing and certifying patients' eligibility for home health care services and for reviewing patient plans of care for medical appropriateness. (Id. at ¶ 59). Relator Chandra Merritt ("Relator") is a Certified Occupational Therapist. (Id. at ¶ 6). Relator worked for the Tifton Agency from 2011 until her termination on May 7, 2020. (Id.).

Relator filed this *qui tam* action on February 11, 2021, alleging Defendants violated the FCA and the AKS. Relator claims that during her ten years working for Amedisys, she witnessed abuses of the Medicare Program, including false certification of ineligible patients and billing for services for which a patient did not qualify or that were not actually rendered. She further alleges that she witnessed Amedisys compensating Dr. Graham for referring new patients to the agency and

---

[1] Throughout her Complaint, Relator refers to the two Amedisys entities collectively. For clarity, the Court will do the same. However, the Court recognizes Defendants' position that they are independent organizations and are not otherwise interchangeable. (Doc. 29-1, p. 2).

falsifying patient certification forms. When Relator voiced her concerns, Amedisys responded by terminating her employment.

Pursuant to 31 U.S.C. § 3730(b)(2), the Complaint was placed under seal to permit the United States an opportunity to investigate Relator's allegations and to decide whether to intervene in the action. (Doc. 3). The Government requested, and the Court granted, two extensions of the seal and the time to consider intervention. (Docs. 8, 10, 11, 13). On April 18, 2022, the Government provided notice of its election not to intervene in the case. (Doc. 14). The Court lifted the seal on April 19, 2022, and ordered service on Defendants. (Doc. 15).

### A.    Regulatory Framework

The FCA provides for an award of treble damages and civil penalties for knowingly presenting or causing to be presented false or fraudulent claims for payments to the Government; for knowingly making or using, or causing to be made or used, false records or statements material to false or fraudulent claims paid by the Government; and for knowingly and improperly avoiding an obligation. (Id. at ¶ 8) (citing 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G)). The FCA additionally prohibits knowing and willful receipt of payments intended to induce referral of services and provides for relief from retaliatory actions. (Id. at ¶¶ 12, 13-17) (citing 31 U.S.C. § 3720(h); 42 U.S.C. § 1320a-7b(b)).

The alleged FCA violations in this case arise within the Medicare Program. Established under Tile XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq.,

the Medicare Program provides health insurance coverage for eligible citizens. (Id. at ¶ 18). The United States Department of Health and Human Services, through the Center for Medicare and Medicaid Services ("CMS"), administers the Medicare Program. (Id.).

Pertinent to this case, the Medicare Program provides some home health care services for eligible Medicare recipients. (Id. at ¶ 19). To be eligible, a Medicare recipient must:

(i)     need intermittent skilled nursing services or physical, speech, or occupational therapy;

(ii)    be homebound (as defined by Medicare);

(iii)   have an established care plan that is periodically reviewed by a physician;

(iv)   be under the care of a physician; and

(v)    have a "face-to-face" encounter with a physician who can assess the patient and personally certify the recipient's eligibility for services.

(Id. at ¶ 20) (citing 42 U.S.C. § 1395(f)(a)(2)(C); 42 C.F.R. 424.22). Covered services for eligible recipients include: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aid services; and (5) medical equipment and supplies. (Id. at ¶ 22) (citing 42 U.S.C. § 1395x(m)).

Most home health care providers utilize CMS Form 485 to outline the patient's care plan and to certify the patient's Medicare eligibility. (Id. at ¶ 23).

4

CMS Form 485 requires the certifying physician sign and date a certification statement, which includes the following language:

> I certify this patient is confined to his/her home and needs intermittent skilled therapy and/or speech therapy, or continues to need occupational therapy. This patient is under my care, and I have authorized the services on this plan of care and will periodically review the plan. I further certify this patient had a face-to-face encounter that was performed on xx/xx/xxxx by a physician or Medicare allowed non-physician practitioner that was related to the primary reason the patient requires home health services.

(Id. at ¶ 23) (citing CMS Form 485).

> The form further warns:

> Anyone who mispresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws.

(Id. at ¶ 24) (citing CMS Form 485).

**B.    Factual Allegations**

Relator alleges Defendants engaged in four separate fraudulent schemes to defraud the Government in violation of the FCA:

1.    Admission and Certification of Ineligible Patients

Relator claims that while employed by Amedisys, she witnessed the agency admitting nearly every Medicare-insured individual, regardless of eligibility. (Id. at ¶ 46). According to Relator, between 2017 and 2020, Amedisys' patient census for the Tifton Agency ballooned from 170 patients to over 430 patients. (Id. at ¶ 47). Amedisys accomplished this dramatic increase in their

5

patient roster by knowingly admitting non-homebound, and therefore ineligible, patients and by universally recertifying patients for home health care services, ensuring that the agency was able to bill for each enrolled patient for at least 120 days. (Id. at ¶¶ 48-50).

Relator offers the following examples of this purportedly fraudulent practice:

a.    Amedisys admitted Patient B.S. for care from November 26, 2018 through January 24, 2019. (Id. at ¶ 52(a)). Amedisys certified Patient B.S. was homebound and required skilled physical therapy, occupational therapy, and nursing care. Amedisys assigned Relator to provide Patient B.S. nine occupational therapy visits during the certification period. (Id.). Relator asserts Patient B.S. was not homebound and was often absent from home during scheduled home health visits and drove his own vehicle. (Id.). Relator reported her concern regarding Patient B.S.'s eligibility. (Id.). Relator alleges Amedisys ignored her reports. (Id.). Instead, Amedisys continued to bill Medicare for services provided to Patient B.S. (Id.).

b.    Amedisys admitted, discharged, and re-admitted Patient G.S. numerous times between 2011 and 2020. (Id. at ¶ 52(b)). According to Relator, Patient G.S. did not meet Medicare's homebound requirement. (Id.). Patient G.S. regularly left his home, including going to breakfast at local fast-food restaurants almost daily. (Id.). He also routinely walked over 300 feet to the end

6

of his driveway. (<u>Id.</u>). Relator reported Patient G.S. to the Amedisys compliance hotline on June 23, 2017. (<u>Id.</u>). Amedisys responded by removing Relator as Patient G.S.'s occupational therapist. (<u>Id.</u>).

2. <u>Billing for Medically Unnecessary or Excessive Services</u>

Relator alleges Amedisys routinely billed Medicare for skilled home health care services that were medically unnecessary and excessive because the patients did not require skilled care. (<u>Id.</u> at ¶ 53). Relator states she and other clinicians regularly informed Amedisys that certain patients did not require skilled nursing and therapy services. (<u>Id.</u> at ¶ 54). Some clinicians ceased performing prescribed but unnecessary therapies. (<u>Id.</u> at ¶ 55). Yet Amedisys continued to bill Medicare for medically unnecessary, excessive, and duplicative services as well as for unperformed services. (<u>Id.</u> at ¶¶ 54-55). Relator further alleges Amedisys "up-coded" unskilled services as skilled services. (<u>Id.</u> at ¶ 56).

Relator offers the following examples of patients for whom Amedisys billed for unnecessary or unperformed services:

  a. Amedisys admitted Patient M.W. for home health care services on January 23, 2019. (<u>Id.</u> at ¶ 57(a)). Patient M.W. was prescribed seven occupational therapy visits and eleven physical therapy visits between January 23, 2019 and March 23, 2019. (<u>Id.</u>). Relator was the occupational therapist assigned to Patient M.W. (<u>Id.</u>). Relator quickly assessed that Patient M.W. could perform all her activities of daily living, went on regular walks, and

7

attended church. (Id.). Patient M.W. therefore did not require occupational therapy. (Id.). Relator informed Amedisys accordingly. (Id.). However, Amedisys continued to bill Medicare for these allegedly medically unnecessary services and recertified Patient M.W. for home health care services through January 2020. (Id.).

       b.     Amedisys admitted Patient C.S. for home health care services from April 4, 2016 through November 19, 2018. (Id. at ¶ 57(b)). During the certification period from September 21, 2018 to November 19, 2018, Patient C.S. was prescribed, and Amedisys billed Medicare, for fifteen skilled nursing visits and twelve speech therapy visits. (Id.). In reality, the only service Patient C.S. received was weekly catheter changes. (Id.).

       c.     Amedisys admitted Patient J.C. for home health care services on February 23, 2018, and recertified the patient for care through at least August 21, 2018. (Id. at ¶ 57(c)). For the June 23, 2018 to August 21, 2018 certification period, Patient J.C. was prescribed, and Amedisys billed Medicare for, three occupational therapy visits and seven physical therapy visits. (Id.). The only service Amedisys actually provided to Patient J.C. was monthly catheter changes. (Id.).

       d.     Amedisys admitted Patient P.R. for home health care services from September 16, 2018 through May 7, 2019. (Id. at ¶ 57(d)). During the first two weeks of care, grab bars were installed in Patient P.R.'s bathroom.

8

(Id.). She was instructed how safely to transfer into and out of the bath. (Id.). Once Patient P.R. mastered this skill, she no longer required occupational therapy. (Id.). Relator contends Amedisys should have discharged Patient P.R. at this point. (Id.). Instead, Amedisys continued billing Medicare for services provided to Patient P.R. for another six months. (Id.). Relator alleges Amedisys fraudulently coded unskilled services, such as bathing and drying the patient's hair, as occupational therapy services provided by Relator. (Id.). Relator claims these services should have been performed by a home health aid at a reimbursement rate of $94 per visit. (Id.). By requiring Relator to perform these unskilled services, Amedisys was able to assess a reimbursement rate of $200 for each visit. (Id.).

### 3.   Illegal Payments for Referrals and False Certifications

Relator accuses Dr. Graham of serving as nothing more than "a physician signature for hire" for Amedisys. (Id. at ¶ 63). Relator alleges Dr. Graham willingly and falsely certified ineligible home health care patients in exchange for payment from Amedisys. (Id.). Relator states she witnessed Dr. Graham sign knowingly false patient certification forms in exchange for the $400-600 hourly rate he received as Medical Director for the Tifton Amedisys Agency. (Id. at ¶ 64).

Relator alleges that when a patient's treating physician declined to certify a patient for continued home health care, Amedisys would request Dr. Graham take the patient under his care. (Id. at ¶ 65). Amedisys often presented hundreds

9

of certifications for Dr. Graham's signature at once. (Id.). Dr. Graham signed the stack of documents without reviewing any documentation and without verifying patients' continued eligibility for home health care. (Id.). Dr. Graham did not attend patient care conferences, which took place on Wednesdays and Thursdays. (Id. at ¶ 67). However, Amedisys compensated Dr. Graham at a rate of $400-$600 per hour for these weekly conferences. (Id.).

Relator offers Patient M.B. as an example of Amedisys' arrangement with Dr. Graham. (Id. at ¶ 70). Dr. Cameron Nixon certified Patient M.B. as eligible for home health care on July 20, 2017. (Id.). Dr. Nixon specifically approved Patient M.B. for skilled speech therapy. (Id.). In March 2018, Dr. Nixon determined Patient M.B. no longer required these services and did not recertify her. (Id.). Amedisys then requested Dr. Graham undertake Patient M.B.'s care. (Id.). Dr. Graham certified Patient M.B.'s continuing eligibility. (Id.).

Relator further alleges Dr. Graham referred significant numbers of patients exclusively to Amedisys. (Id. at ¶¶ 71-72). Amedisys relied on this referral system to increase its patient census in Tifton. (Id. at ¶ 73). Relator claims she has personal knowledge Amedisys paid Dr. Graham for referrals from his medical practice. (Id.). Spikes in referrals resulted in increased hourly compensation to Dr. Graham for his services as Medical Director. (Id. at ¶ 74).

4.   <u>Retaliation</u>

Relator claims she "regularly and repeatedly" voiced her concern that Amedisys was providing home health care services to ineligible patients. (<u>Id.</u> at ¶ 77). She informed Amedisys that continuing to bill Medicare for ineligible patients constituted fraud. (<u>Id.</u>). Amedisys in turn retaliated against Relator, ostracizing her and removing patients from her case load. (<u>Id.</u> at ¶¶ 78-80). Amedisys' actions placed Relator in danger of not meeting productivity requirements and caused her to lose pay and employment benefits. (<u>Id.</u> at ¶ 80).

In July 2018, Relator met with Amedisys' Area Vice President Monica Rouse. (<u>Id.</u> at ¶ 82). Relator complained that the Tift Agency was requiring her to treat non-homebound patients who did not require skilled occupational therapy. (<u>Id.</u>). She informed Ms. Rouse that she reported these issues to the Tift Agency, but the local office ignored her concerns and had begun retaliating against her. (<u>Id.</u>). Ms. Rouse acknowledged the validity of Relator's concerns, but nothing changed. (<u>Id.</u>).

On November 15, 2018, Relator raised concerns about the living conditions of Patient D.M. during a patient care conference (<u>Id.</u> at ¶ 83). Relator informed Amedisys that the small trailer in which Patient D.M. resided was covered in animal feces and was unsanitary. (<u>Id.</u>). Relator urged Amedisys to report the deplorable conditions to a social worker at the Georgia Division of Adult Protective Services. (<u>Id.</u>). Relator also expressed her belief that Patient

11

D.M. was physically capable of caring for herself and did not require occupational therapy; however, Patient D.M. suffered from mental and behavioral health problems which impeded her ability to attend to her needs. (Id.). Relator opined Patient D.M. would be better suited for assisted living. (Id.). Amedisys ignored Relator's concerns and took no action, continuing to bill Medicare for occupational therapy Patient D.M. did not need. (Id.).

Ms. Rouse was present at the November 2018 meeting. (Id. at ¶ 84). Despite her earlier assurances to Relator that she would address any eligibility issues, Ms. Rouse declared that clinicians would no longer play a role in determining patient eligibility, treatment, or plans of care. (Id.). Relator and a fellow clinician opposed this new policy. (Id. at ¶ 85). Relator informed Ms. Rouse that delegating these responsibilities to someone who does not interact with patients would result in further Medicare fraud. (Id.). Relator exclaimed, "this is illegal . . . all the continued recertifications are ineligible and not homebound and [the unnecessary care billed for by Tifton staff] was duplication of services." (Id. at ¶ 86). Relator then asked, "How can we bill this? How can we bill for non-homebound patients and how can we bill for therapy when no therapy is provided?" (Id.). Ms. Rouse replied, "Don't worry about it. . . . Amedisys' attorneys will back you." (Id. at ¶ 87).

On November 19, 2018, Ms. Rouse chastised Relator for inciting the fraud discussion at the November 15 meeting. (Id. at ¶ 88). She warned Relator, "if we

12

can't find a common ground, we will have to part ways." (Id.). Relator became less vocal about her concerns and instead began refusing to treat ineligible patients or patients she believed did not require skilled occupational therapy. (Id. at ¶ 89). Amedisys responded by moving these patients to other clinicians and not assigning new patients to Relator. (Id. at ¶ 90).

On March 25, 2020, Relator complained to Amedisys' management about purported up-coded and medically unnecessary services billed to Medicare. (Id. at ¶¶ 91-92). Those concerns were communicated to Ms. Rouse, who again warned Relator about the need to "find common ground." (Id. at ¶ 93). Relator suggested Amedisys transfer her to another office with different management. (Id. at ¶ 94). Amedisys rejected Relator's offer. (Id.).

Amedisys suspended Relator on April 6, 2020, and ultimately terminated her on May 7, 2020. Amedisys claimed Relator acted outside the scope of her practice area in her treatment of Patient N.D. during a visit on February 25, 2020. (Id. at ¶ 95). According to Relator, she saved Patient N.D.'s life by performing "percussion" to loosen phlegm in the patient's chest, allowing him to breathe. (Id. at ¶ 97). Amedisys determined Relator exceeded the scope of the care she was authorized to provide because Patient N.D.'s plan of care did not include percussion treatment. (Id. ¶ 98). Amedisys still billed Medicare for this purportedly improper care. (Id. at ¶ 99). Relator further alleges she is aware of other clinicians employed by Amedisys who harmed patients by performing

13

services outside the scope of their practice areas yet were not disciplined by Amedisys. (Id. at ¶ 100). Relator contends Amedisys terminated her in retaliation for her efforts to prevent the submission of false claims to Medicare. (Id. at ¶ 101).

## II.   LEGAL STANDARD

On a motion to dismiss, the Court must accept as true all well-pleaded facts in a plaintiff's complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009). To avoid dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports a plaintiff's claims. Twombly, 550 U.S. at 556.

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleading is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Twombly, 550 U.S. at 554-55 (quoting Conley v. Gibson, 355 U.S. 41,

47 (1957)) (internal quotation marks omitted) (alteration in original). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Id.* at 555 (citations omitted) (alterations in original). The complaint must contain enough factual allegations to "raise a right to relief above the speculative level." Id. at 555-56.

In addition, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to causes of action brought under the FCA. Hopper v. Solvay Pharm., Inc.*,* 588 F.3d 1318, 1324 (11th Cir. 2009). Under Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). An FCA complaint must plead not only the "who, what, where, when, and how of improper practices," but also the "who, what, where, when, and how of fraudulent submissions to the Government." Corsello v. Lincare, Inc.*,* 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted). Rule 9(b) serves to ensure that a FCA claim has "some indicia of reliability . . . to support the allegation of an actual false claim for payment being made to the Government." United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,* 290 F.3d 1301, 1313 n.24 (11th Cir. 2002).

15

## III.    DISCUSSION

### A.    Group Pleading

Defendants argue Relator's Complaint impermissibly relies upon group pleading and should be dismissed. Relator names both Amedisys, Inc. and Amedisys Georgia, L.L.C. as Defendants in this action. However, throughout her Complaint, Relator refers to the two entities generically as Amedisys. Defendants contend this lumping together of the two corporate entities fails to place Defendants on notice of which Defendant Plaintiff contends is responsible for which conduct.

Federal Rule of Civil Procedure 8(a)(2) provides that to state a claim for relief, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Generally, "group pleading," or referring to defendants collectively rather than to each defendant specifically by name, fails to meet the pleading standard of Rule 8(a)(2). See Diamond Resorts U.S. Collection Dev., LLC v. Sumday Vacations, LLC, No. 6:19-cv-982-Orl-78DCI, 2020 WL 3250130, at *2 (M.D. Fla. Feb. 21, 2020). Where, however, the "complaint can be fairly read to aver that all defendants are responsible for the alleged conduct," group pleading "does not render the complaint deficient." Kyle L. v. Chapman, 208 F.3d 940, 944 (11th Cir. 2000); see also Nafta Traders, Inc. v. Corkcicle, LLC, No. 6:19-cv-1672-Orl-78GJK, 2020 WL 7422061, at * 2 (M.D. Fla. May 27, 2020) (concluding that collective pleading does not run afoul of

federal pleading requirements provided "the allegations give the individual defendants sufficient notice" of the wrongdoing "they are alleged to have committed").

The Court declines to dismiss Relator's Complaint based on Defendants' assertion of group pleading. The Complaint sufficiently identifies each Defendant and how they are related. Moreover, the Complaint clearly outlines who was involved in each of the acts alleged such that Defendants are on notice of the claims asserted against them. The collective reference of the two Amedisys entities as Amedisys does not deprive Defendants of fair notice of the conduct attributed to them.

### B.    Submission of a False Claim (Counts I and II)

In Counts One and Two of her Complaint, Relator alleges Defendants violated 31 U.S.C. § 3729(a)(1)(A) by presenting, or causing to be presented, false claims to the Government for payment. Specifically, Relator alleges Defendant Amedisys submitted false claims for home health care services on behalf of recipients who either did not meet Medicare's homebound criteria or who did not require skilled nursing and therapy services. Relator further alleges Amedisys submitted false claims for home health care services that were medically unnecessary or never performed. This fraud was perpetuated by Defendant Dr. James Graham's knowingly signing home health care certifications and plans of care for ineligible patients. Defendants move to

dismiss Counts One and Two of Relator's Complaint, arguing that Relator has failed to allege the submission of a false claim with particularity as required by Rule 9(b).

The FCA imposes liability on any person who "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Liability under the FCA does not attach "merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." Clausen, 290 F.3d at 1311 (emphasis in original). The "act of submitting a fraudulent claim to the [G]overnment is the *sine qua non* of a [FCA] violation." Corsello, 428 F.3d at 1012 (quotation and citation omitted). "Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required" under the FCA. Clausen, 290 F.3d at 1311 (emphasis in original).

Allegations of an FCA violation must meet the heightened pleading standard of Rule 9(b). Estate of Helmly v. Bethany Hospice and Palliative Care of Coastal Ga., 853 F. App'x 496, 501 (11th Cir. 2021) (citing Corsello, 428 F.3d at 1012; United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1357 (11th Cir. 2006)). As the Eleventh Circuit explained in Corsello, submission of a fraudulent

claim may not be inferred from allegations of improper practices. 428 F.3d at 1013. To meet the Rule 9(b) pleading standard, the complaint must include:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

Clausen, 290 F.3d at 1210 (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)). More succinctly, a relator must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the [G]overnment." Corsello, 428 F.3d at 1014.

Relator's Complaint carefully details Defendants' allegedly fraudulent practices, naming specific dates of service for patients Relator contends Defendants approved for home health care services but who did not qualify or did not need those services. Missing, however, are details regarding the actual submission of any claim for payment of these allegedly fraudulent services. The Complaint contains no information about the amounts or dates of any charges, the specific services for which Defendants billed the Government, the names of any persons involved in the billing, or a copy of any bill or payment. Rather, as highlighted by Defendants, Relator broadly states Defendants billed the Government for fraudulently performed or underperformed services and summarily claims the Government paid those bills.

19

Relator does not deny the absence of specific billing details in the Complaint. Nor does she deny a lack of personal knowledge that Defendants' billing office submitted a bill to the Government. Nevertheless, Relator argues based on the particular circumstances of this case, the Court should not dismiss her false presentment claims under Rule 9(b). Relator maintains the Court should afford "some indicia of reliability" to her claim that Defendants submitted false claims to the Government based on Relator's ten years of employment, during which she "personally observed, reported, and endured the submission of false claims." (Doc. 32, p. 10) (citing United States ex rel. Mastej v. Health Mgmt. Assoc., Inc., 501 F. App'x 693, 704 (11th Cir. 2014)). According to Relator, because the Complaint sets forth a factual basis for the assertion that fraudulent claims were submitted, exact billing data is not required for the Complaint to survive a motion to dismiss.

In Clausen, the Eleventh Circuit explained that the purpose of Rule 9(b)'s heightened pleading requirement in fraud actions is to alert "defendants to the precise misconduct with which they are charged" and to protect "defendants against spurious charges of immoral and fraudulent behavior." 290 F.3d at 1310 (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1201 (11th Cir. 2001)). In the context of the FCA, that means a plaintiff may not "merely . . . describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted,

were likely submitted[,] or should have been submitted to the Government." Id. at 1311. "[S]ome indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." Id. (emphasis in original).

As observed by another jurist in this district, Clausen "has been read to hold that the minimum indicia of reliability required to satisfy Rule 9 are the specific contents of actual claims." United States ex rel. Willis v. Angels of Hope Hospice, Inc., No. 5:11-CV-041 (MTT), 2014 WL 684657, at *7 (M.D. Ga. Feb. 21, 2014). But such specifics are not always warranted. Id. For example, in Hill v. Morehouse Med. Assoc., the Eleventh Circuit distinguished the pleading requirements imposed on a corporate outsider, who provides no factual basis for the conclusion that false bills were submitted to the Government, versus an employee of the defendant, who offers a firsthand account of the defendant's specific fraudulent conduct. 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003). The Eleventh Circuit accordingly signaled that a more relaxed pleading standard may be applied when the relator "witnessed firsthand the alleged fraudulent submissions" thereby providing "the indicia of reliability that is necessary in a complaint alleging a fraudulent billing scheme." Id. at *5; see also United States ex rel. Walker v. R & F Prop. of Lake Cnty., Inc., 433 F.3d 1349, 1360 (affirming denial of motion to dismiss where the complaint identified the relator as an employee of the defendant and asserted allegations sufficient to explain why the

employee believed the defendant submitted false or fraudulent claims). Several years later, the Eleventh Circuit again emphasized tolerance "toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." United States ex rel. Matheny v. Medco Health Sol., Inc., 671 F.3d 1217, 1230 (11th Cir. 2012). In short, "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b)" must be evaluated on a case-by-case basis. McInteer, 470 F.3d at 1358.

Under the circumstances presented in this case, the Court is satisfied that the requirements of Rule 9(b) have been met. Relator worked for Defendants for ten years. During the last several years of her employment, Relator witnessed an extreme uptick in patient admissions, which she claims was accomplished by Defendants knowing admission and recertification of ineligible patients. Relator offers the names and dates of certification for several patients for whom she personally provided occupational therapy services. She interacted with these patients on an individual basis and was able to assess their therapy needs. Moreover, she regularly voiced her concern that Defendants were committing Medicare fraud, telling Defendants, "this is illegal . . . all the continued recertifications are ineligible and not homebound and [the unnecessary care billed for by Tifton staff] was duplication of services." (Doc. 1, ¶ 86). She also asked, "How can we bill this? How can we bill for non-homebound patients and

how can we bill for therapy when no therapy is provided?" (<u>Id.</u>). Defendants replied, "Don't worry about it. . . . Amedisys' attorneys will back you." (<u>Id.</u> at ¶ 87). Taking these allegations as true, it logically follows that Defendant were submitting bills to the Government for the allegedly fraudulent services rendered.

Concluding Relator has alleged facts sufficient to establish sufficient indicia of reliability that Defendants submitted false claims for payment to the Government, the Court **DENIES** Defendants' motion to dismiss Counts One and Two of Relator's Complaint.

### C.    Creation of False Records or Statements (Counts III and IV)

Relator alleges in Counts Three and Four that Defendants knowingly made or used false records to procure payment from the Government. Relator contends Defendants knowingly included false information on CMS Forms 485, certifying unqualified patients as homebound and in need of skilled nursing and therapy services. Relator alleges the false information notated on these forms was material to Defendants' objective of getting false claims paid or approved by the Government. Relator further alleges Defendant Amedisys made or used false CMS Forms 1450 and 855 A and other false certifications concerning past, present, and future compliance with prerequisites for payment or reimbursement by the Government.

To state a claim under § 3729(a)(1)(B), a relator must show that: "(1) the defendant made (or caused to be made) a false statement, (2) the defendant

knew it to be false, and (3) the statement was material to a false claim." United States ex rel. Phalp v. Lincare Holdings, Inc., 857 F.3d 1148, 1154 (11th Cir. 2017). What § 3729(a)(1)(B) "demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid or approved by the Government." Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 671 (2008) (internal quotation marks omitted). If a defendant makes a false statement but does not intend the Government to rely on that false statement "as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim" by the Government, and there is no FCA violation. Id.

Relator alleges Amedisys "made and used false records reflecting nursing and therapy visits that were not medically necessary, did not qualify as skilled services, or were rendered to patients who did not qualify under the Medicare home health benefit." (Doc. 1, ¶ 111(a)). Relator further alleges Graham participated in completing and approving these forms, knowing that the information contained therein was false. (Id. at ¶¶ 116-117). According to Relator, Defendants knowingly included false information in these records, specifically CMS Form 485, for the purpose of inducing the Government to pay for services Defendants knew did not qualify for reimbursement. (Id. at ¶¶ 111-114, 117-119).

24

Defendants argue Relator's reliance on Form 485 and others is misplaced as submission of the Medicare forms is not required for payment of any claim. Rather, those forms are more ministerial in nature and are simply to be kept on file by the home health care agency. That may be true. But, as Relator points out, to state a claim under § 3729(a)(1)(B), Relator need not show that Defendants presented the falsified records to the Government. Rather, the Relator must only demonstrate that Defendants created the false records with the intent to secure payment for a false claim. For the purposes of this motion, the Court is satisfied that Relator has met this pleading requirement. The Court therefore **DENIES** Defendants' motion to dismiss Counts Three and Four.

### D.    Anti-Kickback Statute (Count V)

In Count Five of her Complaint, Relator asserts Defendants violated the AKS. A violation of the AKS arises when a person or entity "knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind" when that remuneration is given "in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." (Id. at ¶ 15) (citing 42 U.S.C. § 1320a-7b(b)). A violation of the AKS constitutes a false or fraudulent claim for purposes of the FCA. (Id. at ¶ 14) (citing 42 U.S.C. § 1320a-7b(g)). The AKS requires no proof of a person's

25

motivation to accept the illegal payment, only that the person knowingly and willfully accepted the kickback. (Id. at ¶ 17).

Defendants address Count Five solely in connection with Counts One and Two, arguing only that Relator cannot pursue a claim under the AKS because Realtor's Complaint does not sufficiently allege the submission of a false claim. As discussed, the Court is satisfied that Relator has met the heightened pleading requirements to maintain her false submission claims. Defendants having raised no other grounds for dismissing Relator's AKS claim, the Court **DENIES** Defendants' motion to dismiss Count Five of Relator's Complaint.

### E.    Conspiracy (Count VI)

Count IV of Relators' Amended Complaint alleges Amedisys and Graham conspired with one another to violate the FCA pursuant to 31 U.S.C. § 3729(a)(1)(C). Section 3792(a)(1)(C) imposes liability on any person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid. 31 U.S.C. § 3792(a)(1)(C). To state a claim for conspiracy to violate the FCA, a relator must show: "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to affect the object of the conspiracy; and (3) that the [Government] suffered damages as a result of the false or fraudulent claim." Corsello, 428 F.3d at 1014. A conspiracy rarely can be established by showing "an explicit agreement; most conspiracies are inferred

from the behavior of the alleged conspirators . . . and from other circumstantial evidence." <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 569 (11th Cir. 1998) (citation omitted).

Relator's allegations of conspiracy meet the heightened pleading requirements of Rule 9(b). Relator plainly alleges that Graham and Amedisys entered into an agreement whereby Amedisys agreed to compensate Graham for certifying patients Defendants collectively knew did not meet Medicare's eligibility requirements for home healthcare services for the purpose of securing payment from the Government. (Doc. 1, ¶ 126). According to Relator, Graham served as nothing more than a "signature for hire." (<u>Id.</u> at ¶ 63). Amedisys regularly presented Graham with stacks of patient certification forms, which Graham signed without conducting any sort of eligibility review. (<u>Id.</u> at ¶¶ 65-68). Amedisys further incentivized Graham to refer patients from his personal practice exclusively to Amedisys and relied upon Graham to certify patients whose own treating physicians determined were no longer eligible for home healthcare. (<u>Id.</u> at ¶¶ 65, 71-72, 74). With these false certifications in hand, Amedisys then submitted claims for payment to the Government. (<u>Id.</u> at ¶¶ 128-29). As a result of the agreement between Graham and Amedisys, the Government paid Amedisys for fraudulently obtained services. (<u>Id.</u> at ¶ 130).

The Court accordingly finds Relator has sufficiently set forth a claim for conspiracy under the FCA. The Court therefore **DENIES** Defendants' motion to dismiss Count Six of Relator's Complaint.

### F.    Reverse False Claim (Count VII)

Defendants next move to dismiss Count Seven of Relator's Complaint, which alleges Defendants are liable under § 3729(a)(1)(G) of the FCA for reverse false claims. Defendants contend Relator's claim is redundant of the claims raised in Count One and otherwise fails to meet the heighted pleading requirements of Rule 9(b).

The FCA imposes liability on "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). "This is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." Matheny, 671 F.3d at 1222 (citation omitted). "To establish a reverse false claim, a relator must prove: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay

28

money to the government; and (5) the materiality of the misrepresentation." Id. (citations omitted).

Defendant contends Relator's reverse false claim cause of action is nothing more than a duplication of her other FCA claims. While the facts underlying Relator's reverse false claim allegations closely relate to those supporting her other FCA claims, Relator sets forth a separate and independent cause of action based on Defendants' knowing retention of overpaid funds. Relator alleges that Defendants knowingly completed forms certifying patients for home healthcare services for which those patients were not eligible. Based on those certifications, Defendants then submitted false statements to the Government for payment to which Defendants knew they were not entitled, creating an overpayment. Relator further alleges Defendants were aware of the overpayment and of their obligation to refund those payments but instead retained the funds and continued billing the Government. These allegations are sufficient to meet the heightened pleading requirements of Rule 9(b) and to state a separate claim for a reverse false claim. The Court therefore **DENIES** Defendants' motion to dismiss Count Seven of Relator's Complaint.

### G. Retaliation (Count VIII)

Relator alleges Amedisys terminated her in retaliation for her efforts to report and prevent Medicare fraud. The FCA "protects employees who are targeted by their employers after they seek to prevent a violation of the Act."

Hickman v. Spirit of Athens, Ala., Inc., 985 F.3d 1284, 1286 (11th Cir. 2021) (citing 31 U.S.C. § 3720(h)(1)). To state a claim of retaliation, a plaintiff must allege three essential elements: "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." Simon ex rel. Fla. Rehab. Assocs., PLLC v. Heathsouth of Sarasota L.P., 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022).

Defendants move to dismiss Relator's retaliation claim based solely on impermissible group pleading. The Court rejected Defendants' group pleading argument. Defendants do not otherwise contend that Relator has failed to state a claim of retaliation under the FCA. The Court accordingly **DENIES** Defendants' motion to dismiss Relator's retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss (Docs. 29).

**SO ORDERED** this 23rd day of August, 2023.


_s/ Hugh Lawson_____
**HUGH LAWSON, SENIOR JUDGE**


aks